UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO,<br><br>                              Plaintiffs,<br><br>v.<br><br>KIRSTJEN NIELSEN, et al,<br><br>                              Defendant. | Case No.:  3:19cv0631-L-AHG<br><br>**ORDER GRANTING DEFENDANTS'  MOTION TO DISMISS** |

Pending before the Court is Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [ECF NO. 8.] Plaintiff filed an opposition and Defendant replied. The matter is submitted on the briefs without oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons stated below, Defendant's motion is **GRANTED**.

**I.     BACKGROUND**

Plaintiff County of San Diego ("County" or "Plaintiff") filed this action against Kirstjen M. Nielsen, Secretary of the Department of Homeland Security; Ronald D. Vitiello, Deputy Director and Senior Official Performing Duties as Immigration and Customs Enforcement Director; Matthew T. Albence, United States Immigration and Customs Enforcement Executive Associate Director; Kevin McAleenan, Commissioner of Customs and Border Protection; and Carla L. Provost, Chief of Border Patrol, all in

their official capacities (collectively "Defendants"). Plaintiff asserts that Defendants violated the Administrative Procedures Act ("APA") and Fifth Amendment of the United States Constitution when they discontinued the "Safe Release" program under which Defendants provided asylum seekers with assistance in reaching their final destinations within the United States pending adjudication of their asylum claims. (*See* Compl. [Doc. 1] ¶¶ 18-19.) The Safe Release program entails helping asylum seekers locate contact information for relatives residing in the United States and outside the County of San Diego, facilitating phone calls between asylum seekers and those relatives, and transporting the asylum seekers and accompanying family members to departure points for bus stations, train stations, and airports. (*Id*. at ¶¶ 18-22.)  Asylum seekers and their families would receive a minimal amount of food for their journeys.  (*Id*.) Plaintiff claims that the Defendants operated the Safe Release program from 2009 until its sudden termination in October 2018

In October 2018, multiple news outlets reported the end of the Safe Release program, with ICE commenting that the termination of the policy was due to limited resources to support the program.  (*Id*. at ¶ 28). Within 24 hours of the announced end of the Safe Release program, Defendants dropped off 40 asylum seekers and accompanying family members at a San Diego bus station with no assistance for traveling to their final destinations.  Plaintiff states that social service agencies Jewish Family Services ("JFS") and San Diego Rapid Response network ("SDRRN"), reported that an average of 20 to 30 family units, or 60 to 80 individuals including young children, have been released into San Diego County each day since October 2018.  (*Id*. at ¶ 29). Many of the asylum seekers arrive in poor health suffering from the flu, upper respiratory infections, injuries, scabies, and/or lice, in addition to emotional or psychiatric issues due to their circumstances.  (*Id.* at ¶¶ 30-31).

As a result of the discontinuation of the Safe Release program, Plaintiff claims it has suffered and will continue to suffer immediate and apparent harms in combating the humanitarian and public health issues created by the end of the Safe Release program,

including providing more personnel to shelter and care for the asylum seekers and their families. Costs for the services now being provided by the County exceeded $1.1 million as of March 22, 2019 and have continued to increase. (*Id*. at ¶¶ 33-37.)

Plaintiff alleges that by suddenly ending the Safe Release program without an opportunity to comment, Defendants have violated the APA's notice and comment requirement, under 5 U.S.C. §§ 553, 706(2)(D), and committed an agency action that is arbitrary and capricious in violation of the APA, under 5 U.S.C. § 706(2)(A). (Compl. ¶¶ 51-52). Plaintiff further alleges that Defendants have violated the procedural due process rights of the County under the Fifth Amendment of the United States Constitution. (*Id*. at ¶ ¶ 62-63). Plaintiff seeks preliminary and permanent injunctive relief and a declaration by the Court that the Defendants actions are void and without legal force and effect.

Defendant filed motions to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim.

## II. DISCUSSION

Rule 12(b)(1) provides for dismissal if subject matter jurisdiction is lacking. Unlike State courts,

> Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). Federal courts must satisfy themselves of jurisdiction over the subject matter before proceeding to the merits of the case. *Ruhrgas AG v. Marathon Oil Co*., 526 U.S. 574, 583 (1999). Subject matter jurisdiction cannot be waived, and the court must dismiss an action whenever it determines subject matter jurisdiction is lacking. Fed. R. Civ. P. 12(h)(3); *see also Hansen v. Dep't of Treasury*, 528 F.3d 597, 600 (9th Cir. 2007).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *See N. Star Int'l v. Ariz. Corp. Comm'n*., 720 F.2d 578, 581 (9th Cir. 1983). The Court may dismiss a complaint as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984). The Court must assume the truth of all factual allegations in the complaint and "construe them in the light most favorable to [the nonmoving party]." *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir. 2002). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Instead, the allegations "must be enough to raise a right to relief above the speculative level." *Id.*

"Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). Plaintiffs Article III and prudential standing claims are analyzed under 12(b)(1). The remaining issue are analyzed under the 12(b)(6) standard.

**A.    Article III Standing**

To meet Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *Maya v. Centex*, 658 F.3d 1060 (9th Cir. 2011)(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The party asserting jurisdiction has the burden of establishing these elements which must be supported with evidence as required at each successive stage of

litigation. *Lujan*, 504 U.S. at 561.  "Though lack of statutory standing requires dismissal for failure to state a claim, lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya*, 658 F.3d at 1067.

In Claim One, Plaintiff asserts a procedural claim arguing it was denied the ability to speak out against the proposed policy changes due to Defendants failure to follow the APA's notice and comment requirements before terminating the Safe Release program. (Opposition at 11.) In Claim Two, Plaintiff argues that the termination of the Safe Release policy was arbitrary and capricious, an abuse of discretion, and not in accordance with law under the APA because the termination deviated from federal regulations, Defendants failed to consider the relevant factors, and failed to articulate a reasonable explanation for their actions.  (Compl. at ¶ 57).  As a result of these violations, Plaintiff claims it suffered a concrete injury because it has spent over $1.1 million by devoting additional personnel and resources to combat the humanitarian and public health crisis Defendants' policy change has caused.  (*Id*.)

In response, Defendants contend that Plaintiff has not suffered a judicially cognizable injury because (1) the decision to discontinue its assistance to paroled asylum seekers does not command the County to take or refrain from taking any action; (2) Plaintiff, as a third party, cannot assert an injury in fact because it lacks a legally cognizable interest in the enforcement of immigration policy against individual asylum seekers; (3) allowing Plaintiff to bring suit against the federal government for the effects of its immigration policies would violate the sovereign prerogative of the federal government.  (Mot. 12-13).

It is established that "[e]conomic injury is clearly a sufficient basis for standing." *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996); *Azar*, 911 F.3d at 558 (A state may show Article III standing where the injury increases use of state-funded services.)  In order to address the needs of the influx of unassisted paroled asylum seekers and their families, the County set up a migrant shelter to provide

food, shelter and medical screening assessments. (Compl. ¶ 32-34.) An average of 76 medical screenings are conducted a day and County employees refer asylum seekers for additional medical care if necessary. (*Id*. at 34.) The County expanded an existing contract with University of California, San Diego ("UCSD") to screen and evaluate asylum seekers for diseases of public health significance and transfer arrivals to the shelter, isolation, or a higher level of care if appropriate. (*Id*. at 35). The County Sheriff's Department provides daily report coordination and the County Department of General Services provides maintenance and support for equipment to allow the County Health and Human Services Agency ("HHSA") staff to work on site. (*Id*. at 36). These services cost over $1.1 million as of March 22, 2019. (*Id*. at 37).

The void in services created by the termination of the Safe Release policy led to a humanitarian and health crisis that required immediate response from the County to protect its citizens. As such, the economic impact Plaintiff has suffered is causally connected to the sudden halt of the policy.

Defendants contend that nothing in the discontinuation of assistance to paroled asylum seekers commands Plaintiff to take this action, claiming that the injuries are "self-inflicted" and that Plaintiff cannot manufacture standing by choosing to spend funds on these services, citing *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976). (Reply at 2). While "self-inflicted" economic injuries may not be sufficient for Article III standing, the Ninth Circuit has held that economic injuries to a state are sufficient where they stem from a discontinuation of health services to citizens due to federal agency interim final rules. *Azar*, 911 F.3d 558. In *Azar*, the state of California sued the director of the federal Health and Human Services agency. *Id*. at 566. The state claimed that three interim final rules that exempted certain entities from the contraceptive coverage of the Affordable Care Act violated the APA and caused economic harm to the state. *Id*. at 567. The Court found that women would lose contraceptive coverage in their insurance plans, and would need to take advantage of state subsidized family planning and contraceptive services for a potential cost of $18.5 million. *Id.* at 572. The Court held that the plaintiffs had Article

III standing because the potential economic injury was due to the interim final rules' impact on citizens. *Id*. at 571.

Just as in *Azar*, the asylum seekers here would not have needed the health and safety resources supplied by Plaintiff but for the sudden decision by Defendants to terminate the assistance provided through the Safe Release policy. Accordingly, Plaintiff's economic injury is fairly traceable to Defendants decision to stop assistance to paroled asylum seekers and their families. If the Court was to grant Plaintiffs request to vacate and set aside the decision of Defendants to terminate the Safe Release program, and issue a preliminary and permanent injunction requiring Defendants to provide asylum seekers and their family members with the assistance that was previously provided under Safe Release, Plaintiffs would no longer have to provide these services and incur the associated costs.

Accordingly, Plaintiff meets the threshold for establishing Article III standing based on financial injury because it has "suffered an injury-in-fact that is fairly traceable to the challenged conduct and that is likely to be redressed by a favorable judicial decision." *Azar*, 911 F.3d at 570.

B.  **Prudential Standing**

Generally, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  The statute contains two provisions; 1) the party claiming the right to sue must identify some "agency action" that affects him or her in the proscribed manner, and 2) the party seeking review must demonstrate that he or she has suffered a "legal wrong" due to the challenged action, or has been "adversely affected or aggrieved" within the meaning of the pertinent statute. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882-83 (1990). "[A] plaintiff seeking judicial review under the Administrative Procedure Act (APA) must show that 'the interest sought to be protected by [him was] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Bennett*

*v. Plenert*, 63 F.3d 915, 917 (9th Cir. 1995)(citing *Association of Data Processing Servicing Organizations, Inc. v. Camp*, 397 U.S. 150 (1970).) If a party seeks review "not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" *National Wildlife Federation,* 497 U.S. at 882.

Defendants claim that the County and its claims are not within the zone of interests protected by the APA because the relevant zone of interests are not those of the APA but of the statue that Plaintiff says was violated, which in this case are the federal immigration statutes, the Immigration and Nationality Act (INA).  (Mot. at 14).  Plaintiffs cannot bring suit under the immigration statutes, according to Defendants, because asylum seeking parolees are the subject of the contested regulatory action, not the County. (*Id*. at 15.)  Defendants contend that the federal immigration statutes do not protect a county such as Plaintiff from bearing the incidental costs associated with the federal immigration policies.  (*Id*.) In response, Plaintiff contends that its claims are within both the "zone of interests" test and the "legal wrong" basis for APA review. (Oppo at 15-17).

*1. Zone of Interests*

The zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S 118, 130 (2014). "The question under the zone-of-interests test of § 702 is simply whether the language of the statutes invoked by the plaintiff or the supporting legislative history suggests a congressional intent to permit the plaintiff's suit." *Federation for American Immigration Reform v. Reno*, 93 F.3d 897, 902 (D.C. 1996)("*FAIR*"). The test is not exceedingly demanding; Plaintiff does not need to demonstrate "congressional purpose to benefit the would-be-plaintiff ." *Id*.

In *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018), the Ninth Circuit found that plaintiffs had prudential standing despite a challenge by

defendants that the plaintiffs, who were non-profits that provided assistance to asylum seekers, were not within the INA's asylum provisions zone of interests. *Id*. The Court found that "[a]lthough the Organizations are neither directly regulated nor benefitted by the INA, we nevertheless conclude that their interest in 'provid[ing] the [asylum] services [they were] formed to provide' falls within the zone of interests protected by the INA." *Id*.

The asylum seekers paroled into the United States under 8 U.S.C. § 1182(d)(5)(A) of the INA are admitted based on urgent humanitarian reasons or for significant public benefit, therefore, as Plaintiff claims, they are often the most vulnerable including those with serious medical conditions, pregnant women and young children who require medical care and additional services. *See* 8 U.S.C. 1182(d)(5)(A); 8 C.F.R. § 212.5(b). The abrupt termination of the Safe Release program's assistance to this population foreseeably caused an immediate humanitarian and public health crisis to which Plaintiff responded at great cost. Although the County is not directly regulated by the INA, it is at least arguably within the zone-of-interests due to the economic harm it has suffered and continues to suffer as a result of the INA policies.

### 2. *Legal Wrong*

To demonstrate prudential standing under 5 U.S.C. § 702, "the party seeking review under § 702 must show that he has 'suffer[ed] legal wrong' because of the challenged agency action, or is 'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.'" *National Wildlife Federation*, 497 U.S. at 883. Plaintiff argues that the Defendants' arbitrary and capricious policies and violations of the APA's procedural requirements harmed the County and that these allegations are sufficient to make a prima facie showing of a "legal wrong" for prudential standing. (Oppo. at 16.) In response, Defendants contend that "legal wrong" in this section of the APA means the invasion of a legally protected right arising from the common law, Constitution, statute or Congressional intent to confer a benefit, and Plaintiff has failed to point to such a source. (Reply at 6).

Courts have generally held that the phrase "legal wrong" under the APA means that a party has suffered an "invasion of a legally protected right." *Braude v. Wirtz*, 350 F.2d 702, (9th Cir. 1965); *Commonwealth Utilities Corp. v. Johnson*, 245 F.Supp.3d 1239,1257 (D. Northern Mariana Islands 2017).  At least one court has found that a plaintiff may successfully assert standing under the APA for suffering a "legal wrong" that arises not under a statute, but instead from a non-statutory or common law type of review. *Seeger v. United States Department of Defense*, 306 F.Supp.3d 265 (D.D.C. 2018).  The *Seeger* court found that "[s]uch a legal wrong includes an agency's basing its 'decisions on arbitrary or capricious abuses of discretion,' so that 'one who makes a prima facie showing alleging such action on the part of an agency ... has standing to sue' under the APA." *Id*. at 277.  Plaintiff suggests this Court should follow suit. This Court is not bound by the decision in *Seeger*, and finds no controlling authority dictating such a result.[1] Accordingly, Plaintiff lacks standing to pursue its claims under a "legal wrong" theory under the APA.

Moreover, the procedures at issue do not confer standing on Plaintiff because those procedures were not designed to protect a concrete interest of the County.  *Lujan v Defenders of Wildlife*, 504 U.S. 555 at 573 n. 8.  Plaintiff does not argue that it has a procedural right under the INA it seeks to enforce. Instead, Plaintiff contends that Defendants' termination of the Safe Release policy was arbitrary and capricious and an abuse of discretion because Defendants failed to follow procedures under the APA. While the County asserts injuries that arguably fall within the INA's zone of interests, no rights are conferred upon the County by the INA. *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d at 899, 904 (9th Cir. 1996).  The source of Plaintiff's

---

[1] "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Green,* 563 U.S. 692 n.7 (2011).

injuries is at least two steps removed from the alleged procedural defects, therefore the County cannot maintain standing under 12(b)(1) to pursue the claims.

### 3. Judicial Review

Unless "agency action is committed to agency discretion by law, the APA allows for judicial review: 'A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof'." 5 U.S.C. §§ 701(a)(2), 702. Sections 701 through 706 of the APA provide "that agency actions are reviewable under federal question jurisdiction ... even if no statute specifically authorizes judicial review." *Allen v. Milas*, 896 F.3d 1094, 1104 (9th Cir. 2018). Nevertheless, not every agency action is subject to judicial review. The scope of judicial review is limited to "compel[ling] agency action unlawfully withheld or unreasonably delayed; and [¶] hold[ing] unlawful and set[ting] aside" certain kinds of agency actions, findings, and conclusions. *Id.*; § 706.

Defendants assert that judicial review is precluded here because the federal government has not waived sovereign immunity. (*Id.* at 16). Under the doctrine of sovereign immunity, "[t]he United States, as a sovereign, is immune from suit, save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. The APA's waiver of sovereign immunity does not apply 1) "to the extent that statutes preclude judicial review," under 5 U.S.C. § 701(a)(1); and 2) where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 n.3 (9th Cir. 1998) (internal quotation marks and citation omitted). A waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Quarty v. United States*, 170 F.3d 961, 972 (9th Cir. 1999) (internal ellipses, brackets, quotation marks and citations omitted). The APA precludes jurisdiction of federal courts "whenever Congress has provided another 'adequate remedy'." *Id.* at 1004, citing 5 U.S.C. § 704.

Defendants claim that 8 U.S.C. § 1252(a)(2)(B)(ii) and 8 U.S.C. § 1182(d)(5)(A), preclude judicial review. First, Defendants argue that "the decision to parole asylum seekers into the United States" meets the criterion to prevail under § 1252(a)(2)(B)(ii); therefore, the INA and APA bar judicial review and deny any waiver of sovereign immunity. (Mot. at 17-18). Second, the decision whether to temporarily parole asylum-seeking aliens is committed to DHS discretion, and because that process is a matter of judgment and a complicated balancing of multiple factors, Defendants contend "the statute authorizing parole does not itself provide a meaningful standard against which to judge the agency's exercise of discretion." (Mot. at 18-19). Defendant claims that under section 1182(d)(5) the agency's discretion extends not only to the decision whether or not to parole, but also actions taken after parole, such as providing travel and medical assistance to paroled asylum seekers. (Reply at 8). Further, Defendants contend that "urgent humanitarian reasons" or "significant public benefit" are considerations for the determination whether or not to parole an individual asylum seeker, but do not apply for determining the conditions under which paroled asylum seekers are released, for which the statute provides no standard for evaluation. (*Id*.)

In response, Plaintiff argues that judicial review is not barred by section 701(a)(1) because it is not challenging Defendants' decision whether to parole any particular asylum seeker, but instead it is asserting APA claims against policies that apply only after Defendants determine that an asylum seeker should be paroled. (Oppo at 20-21). Plaintiff also asserts that section 701(a)(2)'s exception to APA review for matters committed to agency discretion must be balanced against the presumption of review in section 706(2)(A). (*Id*. at 24). Plaintiff contends that section 701(a)(2)'s exception must be read narrowly to only apply to a statute that provides no "meaningful standard against which to judge the agency's discretion." Here, Plaintiff contends that its procedural and substantive APA challenges to the termination of Safe Release policy would provide sufficient standards to review the policy changes because it can use the "urgent

humanitarian reasons" and "significant public health benefit" standards to determine whether Defendants' change in policy aligns with those goals. (*Id*.)

Section 1252(2)(A) bars judicial review of individual parole decisions, however some courts have rejected a broad reading of the statutory bar, finding that claims challenging the legality of policies and processes under the INA may be reviewed by a court. *See* 8 U.S.C. § 1252(2)(A); *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017); *Aracely R. v. Nielsen*, 319 F.Supp.3d 110, 134 (D.D.C. 2018)(statutory bar did not prevent evaluation of defendants' failure to follow procedures where DHS and ICE implemented new policy of keeping asylum seekers in federal custody pending claim adjudication.) Plaintiff is not challenging Defendants' individual determinations of parole for asylum seekers, but the conditions under which Defendants are releasing these individuals. Plaintiff's argument is unpersuasive because the Attorney General has discretion to "parole into the United States temporarily *under such conditions as he may prescribe* only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. 1182(d)(5)(emphasis added). As a result, Defendants have the discretion to change the conditions under which they parole individuals, including whether they provide travel and basic necessities. Accordingly, judicial review of those decisions under section 1252(a)(2)(B)(ii) is precluded.

Even if the Court had power to review Defendants' decisions regarding what services they provide paroled asylum seekers, there would be "no meaningful standard against which to judge the agency's exercise of discretion" because the statute authorizing parole does not provide a clear benchmark. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.") Instead, the agency must consider "a number of factors which are peculiarly within its expertise." *Id*. at 831. Although the abandoning of vulnerable asylum seekers and their families on to the streets of San Diego without any assistance creates a humanitarian

crisis with potentially significant public health concerns, Plaintiff does not point to any clear standard this Court could employ to determine whether Defendants' actions violated the agency's grant of discretion to parole individuals under conditions it deems appropriate. As a result, the Court lacks jurisdiction to review these claims.

*4. Final Agency Action*

"[T]he fact that an agency decision is not final under the APA is not a defect in subject matter jurisdiction." *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 830 (9th Cir. 2002), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, (2008), *as recognized in Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). Therefore, the Court considers this argument under Rule 12(b)(6).

Where "review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the "agency action" in question must be "final agency action." *n*, 497 U.S. at 882; 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review" (emphasis added).) A two-part test determines whether an agency action is final under the APA: "[f]irst, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature.. . . [a]nd second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (1997) (internal quotation marks and citations omitted). The focus is "on the practical and legal effects of the agency action." *Or. Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 982 (9th Cir. 2006). "The general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.'" *Ukiah Valley Medical Center v. Federal Trade Commission*, 911 F.2d 261 (9th Cir. 1990).

Defendants contend the cessation of assistance to paroled asylum seekers is not a final agency action because it does not have the status of law, and the question it raises is

not a legal one. (Mot. at 20-21). Plaintiffs argue that the discontinuation of the Safe Release policy is subject to judicial review as final agency action under 5 U.S.C. § 704, because the Safe Release program operated consistently from 2009 until the sudden termination and has not been reinstated, therefore it was not a temporary policy change. (Oppo. at 26). In addition, the end of the Safe Release program has produced legal consequences for the County and has had a direct and immediate impact on the day-to-day operations of the County due to the need for humanitarian aid to paroled asylum seekers. (*Id.*) Plaintiff contends this action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). (*Id.* at 26-27).

The discontinuation of the Safe Release program meets the first prong of the *Bennett* test because it is intended as a final action that is not merely tentative. There is no indication that the agency intends to reinstate Safe Release, and no assistance has been provided to paroled asylum seekers through the program since 2018. The termination of the program reflects the consummation of the decision-making process on the issue, despite there being no published pronouncement.

However, the termination of the Safe Release program does not meet the second prong of the *Bennett* test because it did not create a legal obligation on the part of the County. "The imposition of an obligation or the fixing of a legal relationship is the indicium of finality in the administrative process." *Cabaccang v. United States Citizenship and Immigration Services*, 627 F.3d 1313, 1315 (9th Cir. 2010). Plaintiff argues that the agency action produced legal consequences and had an immediate effect on the County's day-to-day operations because it created a public health emergency that required an immediate and costly response from the County. (Oppo at 26). It is undisputed that the influx of vulnerable paroled asylum seekers had an immediate impact on the daily operations of the Plaintiff, but the Court must consider "whether the [action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected." *Ukiah Valley Medical Center*, 911 F.2d at 264. Although Plaintiff

took action to protect its populace and stem any public health issues resulting from the decision, the discontinuation of the Safe Release program did not impose any legal obligations on Plaintiff. Review is precluded because the termination of the Safe Release program is not a "final agency action" ripe for review.

### C.     Due Process Claim

Plaintiff contends that Defendants' sudden termination of the Safe Release program without notice and comment resulted in the deprivation of a property right protected by the Fifth Amendment of the United States Constitution. The Fifth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." (U.S. Const. amend. V.) In the Ninth Circuit, a plaintiff asserting a violation of procedural due process must allege: "(1) the deprivation of a constitutionally protected liberty or property interest, and (2) the "denial of adequate procedural protections." *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018).

Plaintiff asserts that it has a constitutionally protected liberty or property interest in the "expenses it has incurred and will incur, and funds that it has been forced to expend and will expend, as a result of Defendants' unlawful termination of, or change to, the Safe Release policy" without notice or an opportunity to be heard. (Compl. ¶ 62-63). Defendants argue that Plaintiff has not identified any entitlement to federal funds nor any authority granting Plaintiff a constitutionally protected liberty or property interest in the funds it has spent and is spending.  (Mot. 21).

No controlling authority indicates that a county may assert a procedural due process claim for the deprivation of a property interest in funds expended for immigration related expenses. The holding of *County Of Santa Clara v. Trump*, 250 F.Supp.3d 497 (N.D. Cal. 2017), suggests that a county may assert a property interest under the Fifth Amendment for funds to assist with immigration-related expenses, but only where the County has a property interest in federal funds that Congress had already appropriated and the County had accepted.  *Id*. at 536.  *Santa Clara* is unpersuasive in the present case because no such funds were earmarked for Plaintiff, and it does not constitute binding

precedent. *Green,* 563 U.S. at 692 n.7. Accordingly, the Court dismisses the claim under 12(b)(6) for failure to state a legally cognizable theory.

### D. Leave to Amend

Finally, the Court considers whether Plaintiff should be granted leave to amend Counts One and Two. *See Ebner v. Fresh, Inc*., 838 F.3d 958, 963 (9th Cir. 2016). Rule 15 advises leave to amend shall be freely given as justice so requires. Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotation marks and citation omitted).

In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be freely given. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Dismissal without leave to amend is not appropriate unless it is clear the complaint cannot be saved by amendment. *See id*. Because amendment of Claims One and Two would be futile, leave to amend is denied.

### III. CONCLUSION AND ORDER

For the reasons stated above, Defendants motion is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  June 5, 2020

Hon. M. James Lorenz
United States District Judge